**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

|  |  |  |
|---|---|---|
| MELVIN CARTER, | ) | Civil No.: 3:20-cv-_____ |
|  | ) |  |
| Plaintiff, | ) | ACTION FOR DAMAGES, |
|  | ) | DISCRIMINATION, VIOLATIONS |
| v. | ) | OF TITLE VII CIVIL RIGHTS ACT, |
|  | ) | HARASSMENT and |
| EXCEL CONSTRUCTION | ) | PUNITIVE DAMAGES |
| & MAINTENANCE VI, INC., | ) |  |
|  | ) |  |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
|  | ) |  |

## COMPLAINT

**COMES NOW** Plaintiff Melvin Carter, by and through undersigned counsel, and as and for a Complaint hereby alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1343(a); 28 U.S.C. § 1367(a); 29 U.S.C. § 262(c); 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. §§ 1981, 1983 and 1985, 10 V.I.C. § 7; and 24 V.I.C. § 451 *et seq.*

## THE PARTIES

2.     Plaintiff Melvin Carter ("Carter") is a black, African American male and a resident of St. Croix, United States Virgin Islands.

3.     Excel Construction & Maintenance VI, Inc., ("Excel VI") is a contractor providing various services to Limetree Bay Terminal and Oil Refinery ("Limetree") in St. Croix, United States Virgin Islands.

4.     Upon information and belief, Excel VI has had fifteen (15) or more employees throughout the 2020 calendar year and throughout 2021, to date.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 2 of 27**

## BACKGROUND

### Melvin Carter

5.      Carter has earned an Associates degree in Electronic Technology and completed coursework in a B.Sc. in Electrical Engineering Technology program.

6.      Carter also has industrial training in PLCs, Analyzers, Industrial Electricity and other pertinent topics.

7.      Carter is a former Certified Instrumentation Instructor for the National Center for Construction Education and Research ("NCCER"), a nationally recognized provider of training assessment, certification, and career development standards for construction and maintenance companies including Excel VI and its predecessor, Sun Constructors, Inc. ("Sun").

8.      Carter has successfully completed a written NCCER certification test for Maintenance Electrician and Instrumentation Technician qualifications.

9.      Carter's work history includes full-time permanent jobs with Fortune 500 Companies including US Steel, Foster Wheeler, General Electric and some contract work.

10.      Carter first came to work for Excel VI as a stateside recruit on March 15 2011, with Excel Maintenance Services ("Excel Maintenance").

11.      Subsequently, Carter worked for Sun, a division of Excel Maintenance, which would later become Excel VI.

12.      His first position with Excel Maintenance was in Chicago, from March 15, 2011 to September 22, 2011.

13.      The second position was in Fort Dodge, Iowa, from October 1, 2011 to October 21, 2011.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 3 of 27**

14.    In his final capacity he was offered a position with Sun at a higher rate of pay, a weekly per diem, plus paid flights to and from the Island of St. Croix.

15.    This position was with the Safety Instrumented Systems ("SIS") Department of the HOVENSA Oil Refinery ("Refinery").

16.    Carter began working in this position on Tuesday, November 29, 2011, and ended on April 26, 2012, when the refinery closed.

17.    When the refinery closed he received a severance package including funds to ship household items and was offered an airline ticket to a destination of his choice.

18.    Sun also arranged another position for Carter in Freeport, Texas, with Excel Maintenance, which position he declined due to his upcoming nuptials with a Virgin Islander who resided in the Territory.

## Excel Construction & Maintenance VI, Inc.

19.    Excel VI recruits and hires people from the U.S. Virgin Islands (local hires) and from outside the U.S. Virgin Islands, mainly Puerto Rico, the continental United States and the Americas (stateside hires).

20.    Excel VI maintains a two-tier recruitment process and pay scale.

21.    Local applicants, Virgin Islands residents, must use the local recruitment process.

22.    The local recruitment process is more difficult than the stateside process.

23.    Excel VI's local recruiting is conducted exclusively through the Virgin Islands Department of Labor ("VIDOL").

24.    Excel VI does not advertise or conduct any local recruitment activities outside of the VIDOL.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 4 of 27**

25.    Once hired, Excel VI offers lesser compensation to local hires.

26.    Conversely, Excel VI uses an easier recruitment process for stateside hires.

27.    Excel VI offers higher rates of pay and better overall compensation to stateside hires.

28.    This two-tier system has the goal and effect of discouraging and excluding local applicants.

29.    This is despite the fact that the two-tier system makes local hires less expensive for Excel VI than stateside hires.

30.    Excel VI's stateside hiring is conducted in-house.

31.    Stateside applicants are afforded an enviably easy manner to have their candidacy considered.

32.    Those who are able to directly apply through Excel Maintenance, Excel VI's parent company, can apply on its website.

33.    In addition to an applicant's name and contact information, Excel Maintenance's website requests applicants to enter the following information: craft, years of experience, previous employment with Excel, TWIC, current residence, willingness to relocate, preference in type of work, work history and questions or comments.

34.    This constitutes the entire online application.

35.    Three of those questions require a mere "yes" or "no" selection.

36.    The only fields that are required are the "name" and "email" fields.

37.    While the form does not request the applicant's physical or mailing address it devotes one of the thirteen questions to asking for the applicant's current residence.

38.    It is apparent that an applicant's origin is a factor that Excel VI considers

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 5 of 27**

important in hiring.

39.    There are approximately thirty-five (35) to forty (40) employees in the Instrumentation and Maintenance Division ("Maintenance").

40.    Excel VI's local hires are mostly visible minorities, to wit: black (African American or Afro-Caribbean); its stateside hires are majority not visible minorities (e.g., white, non-black Hispanic and other similar classifications).

41.    At present, Carter is one (1) of four (4) black males working in Maintenance.

42.    All other employees in Maintenance are non-black, including non-black Hispanic.

### Post-Excel Construction & Maintenance VI, Inc., Employment

43.    Subsequent to the closing of the Refinery, Carter found a position through the Virgin Islands Department of Labor ("VIDOL") as a contract Instrument Technician for the Virgin Islands Water and Power Authority ("WAPA").

44.    He began as a contractor in October 2012 on the island of St. Thomas.

45.    In February 2013, he was offered the permanent, full time position of Instrument and Control Analyst.

46.    He remained with WAPA on St. Thomas as a permanent full-time employee through August 25, 2018.

47.    While employed at WAPA, Carter received training certificates and work experience for work and equipment similar to that at Limetree.

48.    In early September 2018, Carter accepted a position as an Instrument Technician with Pinnacle Services ("Pinnacle"), another Limetree contractor.

49.    He also worked as an Instrument Planner while with Pinnacle.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 6 of 27**

50.     Carter continued working with Pinnacle until approximately October 2019.

**Return to Excel Construction & Maintenance VI, Inc. - Discriminatory Recruitment**

51.     Carter has continuously sought to advance in his career.

52.     Accordingly, and despite his employment history with Excel VI, Carter has experienced several unnecessarily difficult and unsuccessful attempts to apply for positions with Excel VI as a local applicant.

53.     Nonetheless, on February 13, 2018, Carter applied to Excel VI for an Instrument Technician position through a job listing with VIDOL.

54.     He also sent his application to the Excel VI contact identified in the listing by VIDOL.

55.     Carter further sent a copy of his VIDOL application to Byrd and a copy of his resume to the Excel VI Recruitment email address.

56.     He listed a current Excel VI supervisor as a reference.

57.     Carter never received a response to this application.

58.     On or about October 22, 2019, while employed by Pinnacle, Carter saw an opportunity for a better paying job with Excel VI and commenced a VIDOL application for the position.

59.     The position was for employment as an Instrument Technician.

60.     Carter had job security with Pinnacle and had no reason to leave, but for the fact that the Excel VI position offered a better rate of pay.

61.     In applying for the Excel VI position he noticed that, despite his vast experience of more than twenty-four (24) years in instrumentation, his VIDOL application resulted in his job skills inexplicably not matching the requirements as listed by Excel VI on

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 7 of 27**

the VIDOL website.

62.    Carter had previously applied through VIDOL for a temporary Instrument Technician position with WAPA.

63.    He easily applied and was hired.

64.    Accordingly, he felt confident that the issue is not with the VIDOL system.

65.    On or about October 24, 2019, Carter was on St. Thomas and went to VIDOL's St. Thomas office for assistance with his October 22, 2019, application.

66.    He was assisted by Denee Daniel ("Daniel").

67.    On or about the morning of October 25, 2019, he received an email from Daniel indicating that she was able to get his skills to match the job requirements and that she had submitted an application on his behalf.

68.    Daniel also listed the name of the hiring manager that had been identified by Excel VI, to wit: Andres Poche ("Poche").

69.    Carter, who had carefully written Poche's name on a piece of paper, sought him out later that day at lunch.

70.    Carter encountered Poche in the hallway outside Poche's office.

71.    Carter asked Poche whether Excel VI was hiring Instrument Technicians.

72.    He replied "no."

73.    Carter then pulled the paper out of his pocket and asked him to identify the person whose name was written on the paper.

74.    Carter explained that VIDOL said that Excel VI has an opening and provided that name as the Hiring Manager when he had applied for the Instrument Technician position.

75.    Poche admitted that the name on the paper was his, but that he is not Excel

VI's Hiring Manager.

76.     In fact, Poche appeared to have no knowledge whatsoever concerning the position, Carter's application or the hiring process.

77.     However, that same day Poche took Carter on a short walk over to the office of Cody St. Pierre ("St. Pierre").

78.     St. Pierre  is Excel VI's Hiring Manager.

79.     Having made it through the initial gauntlet of barriers established to deter local applicants, Carter was now face-to-face with the Hiring Manager.

80.     Excel VI expressed interest in his candidacy.

81.     St. Pierre discussed the position with Carter, including that it was in the Maintenance Department and assured him that layoffs communicated in an October 6, 2020, correspondence would not apply to that position as the layoffs were directed to Restart personnel, not Maintenance personnel.

82.     St. Pierre said that he would hire Carter, then immediately cautioned him "not to do any science experiments."

83.     St. Pierre's, "don't do a science experiment" comment struck Carter as odd and not constructive for a number of reasons.

84.     First, he never directly reported to St. Pierre; he always reported to a supervisor that reported to St. Pierre.

85.     Second, therefore, any information St. Pierre had about him would have to be second-hand or hearsay.

86.     Third, the person from Hovensa to whom Carter reported during his employment with Sun was Juancito Gario ("Gario").

87.    Gario never expressed any concerns about his doing "science experiments."

88.    Fourth, Carter had not started this new position yet so this criticism could not be based on his performance.

89.    Finally, this comment did not seem to be flattering or constructive, but rather derogatory.

90.    Carter was not applying for a lab position, so doing "science experiments" was not part of his job description.

91.    Carter would later learn that this was only the beginning of Excel VI's name calling, intimidation, mockery, threats and insults.

92.    St. Pierre's statement that he "would hire" Carter is insufficient for a reasonable person to leave a secure job; Carter had no intention of acting on that statement alone.

93.    At the very least Carter expected a written offer letter or some other written correspondence that would give him enough security to tender his resignation to Pinnacle.

94.    Instead, on or about October 30, 2019, as he exited Excel VI's human resources office, Carter saw his then-current Superintendent, Phillip Mead ("Mead"), sitting in the office next door.

95.    Mead immediately stood up and started yelling and cursing at Carter.

96.    Mead was screaming about Carter's lack of notice.

97.    Carter was very confused at this point since he had not accepted any position or given Excel VI a start date.

98.    Mead had been becoming increasingly angry so, fearing that the confrontation would escalate into a physical altercation, Carter walked away.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 10 of 27**

99.     But the damage had already been done.

100.    Excel VI, by inflaming Mead's passions, had forced Carter's hand and wholly eliminated any opportunity to bargain that he may have had by bringing his employment with Pinnacle to an abrupt end.

101.    Carter finished the day with Pinnacle and never returned.

102.    Carter was later told by his co-workers that St. Pierre had verbally accosted Mead at a meeting that was attended by several contractor representatives from within the refinery.

## Discriminatory Employment Conditions

103.    During the afternoon of October 25, 2019, Carter went to Excel VI's human resources office.

104.    Before finishing his business there, he was told that Wally Byrd ("Byrd") wanted to speak with him.

105.    When Carter went into his office, Byrd requested his resume.

106.    Carter immediately complied, sending a resume from his cell phone.

107.    Having already forced him out of his stable employment with Pinnacle, Excel VI then changed the terms and conditions of Carter's new employment.

108.    Byrd explained that the Instrument Technician position would be in Maintenance.

109.    He also explained that Maintenance was not ready for Instrument Technicians, so Carter would be working with a Refinery Restart crew until Maintenance was ready.

110.    Byrd gave him the contact name and phone number of the Superintendent of Maintenance, Louis Cutway ("Cutway").

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 11 of 27**

111. Byrd told him to contact Cutway on his first day.

112. Byrd also said that there would be a reduction of Instrument Technicians on the Restart side of Excel VI as the work was completed and some of these individuals would join Maintenance.

113. Byrd assured Carter that this would not negatively affect Maintenance.

114. He informed Carter that he was the first Instrument Technician hired for Maintenance and discussed some other items of his new employment.

115. That same afternoon, Carter was waiting for Byrd outside his office.

116. Byrd was speaking with someone on the telephone.

117. Byrd stated that he did not want to hire Instrument Technicians from VI Industrial, a local contractor that had recently lost its contract with Limetree.

118. The Instrument Technicians that were working with VI Industrial were black, local hires and they were still working at the refinery at that time.

119. Byrd said that the VI Industrial workers "did not work like his workers" or words to that effect.

120. When Byrd saw Carter waiting by the door, Byrd asked him about someone, Curtis Fleming ("Flemming"), with whom Carter had previously worked.

121. Flemming was a black, local employee of VI Industrial.

122. Carter stated that Flemming was competent and a good worker.

123. He relayed this information to Byrd.

124. Flemming and other similarly situated black, local hires have been harmed by Excel VI's discriminatory practices.

## Discriminatory Treatment

125.    The promotion of non-black hires that are less-qualified than visible minority hires is common at Excel VI.

126.    Employees who are not visible minorities exclusively receive the unequal benefit of the ability to become competent through on-the-job training after being given a position.

127.    Upon information and belief Cutway has a background as an Electrician.

128.    During the pay week ending November 17, 2019, Cutway was assigning Instrument Technician work to Carter.

129.    Yet Cutway would often report wrong information concerning the instrument work orders.

130.    Accordingly, Carter was asked to join the morning meetings to assist Cutway in answering questions about the instrument work orders.

131.    On or about the pay week ending November 24, 2019, Carter started regularly attending the 6:30 a.m., morning meetings with Cutway.

132.    Carter's role was to receive instrument work orders from the planners, to perform the work and to report the progress or status of the work performed.

133.    Scott Thomas ("Thomas"), a Limetree employee, also attends the morning meetings.

134.    Even though Carter was there to provide the expertise that Cutway lacks, Thomas chastised Carter "not to do a science experiment" during one of Carter's first morning meetings.

135.    After Thomas made that remark, Carter spoke with Gario about it and how

uncomfortable the remarks made him feel.

136.    Carter had never personally worked for Thomas, did not know the basis of the criticism and had never had the basis of the remark explained to him.

137.    Yet Thomas continued this chastisement, repeating the same, derogatory comment that had originated with Excel VI.

138.    On January 7, 2020, four relay models for the #10 boiler detection system were placed on order.

139.    Carter regularly consulted with Gario on this issue.

140.    When the replacement device was specified and the order placed, the alarm stop going off.

141.    This process took about three days.

142.    A white co-worker of Carter claimed to have fixed the problem.

143.    From that point on Thomas and Cutway began to repeatedly admonish Carter "do not do a science experiment" or "do not to take three days" to complete any job.

144.    The repeated chastisement about "not doing a science experiment" continued, unabated, with increasing frequency.

145.    The frequency with which this remark was repeated escalated to the point that it was being said several times a day by both Thomas and Cutway.

146.    Carter again sought counsel from Gario, including sharing what he was working on with him.

147.    Gario seemed perplexed as to why Carter was addressed this way.

148.    No other individual in Maintenance was criticized in a similar manner.

149.    To the contrary, around February 21, 2020, a white stateside hire who joined

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 14 of 27**

Maintenance after Carter, was working on a ground fault.

150. Though it took more than a week for him to complete this job, that employee was never chastised or negatively labeled in any manner whatsoever.

151. On or about February 25, 2020, Carter heard Thomas tell that employee to take as much time as he needed to complete a work order.

152. That employee was granted the privilege of working without undue chastisement and criticism, allowed as much time as he needed and was never labeled or targeted in any way for taking appropriate time to perform the task at hand.

153. Sometime around December 12, 2019, that employee was transferred from Refinery Restart to Maintenance.

154. This was almost one month and a half after Carter had started in Maintenance as an Instrument Technician.

155. Attending the daily, morning meetings had allowed Carter to earn extra money and learn about the work that was needed at Limetree.

156. When that employee began working, Carter was gradually pushed out of this role without explanation.

157. On or about January 9, 2020, Carter passed the NCCER written Instrument Technician Test.

158. On March 17, 2020, he completed the NCCER hands-on exam for Instrument Technicians required to remain in Maintenance.

159. Despite Carter's continuous achievement, Excel VI's criticism worsened.

160. It is clear that Excel VI perceived the repeated criticism of Carter as some sort of sport that it engaged in for its own amusement regardless the effect on Carter.

*Carter v. Excel VI*
Case No. 3:20-cv-
**Complaint**
**Page 15 of 27**

161. The apparent winner was the employee who harassed Carter the most.

162. By about January 10, 2020, Cutway and Thomas, both Limetree employees, were now telling Carter "don't take three days" with almost every communication they made to him.

163. This admonishment was was used exclusively with him, the only black Instrument Technician in the Maintenance Department at that time and was the complete opposite of the treatment given to his non-black counterparts.

164. This disparate treatment became incredibly aggravating and frustrating.

165. This disparate treatment changed Carter's work environment.

166. Carter started responding that Jesus Christ took three days in the grave, so three days was good enough for him.

167. This did not  stop or deter the harassment by Cutway or Thomas; the chastisement and repetition of the phrase continued.

168. At some point Carter directly asked Cutway to stop.

169. He asked Cutway to ask Thomas to stop.

170. Cutway's response was to laugh and tell Carter that the harassment about taking three days would "stop on its own."

## Discriminatory Discipline

171. Excel VI subjects its black and non-black hires to different disciplinary standards.

172. On or about January 24, 2020, Carter's white co-worker told Cutway that Carter "was taking his job."

173. Without enquiry or investigation, Cutway threatened Carter with disciplinary

action if he kept "getting on the nerves" of his white co-worker.

174.   Carter was never given a chance to explain or defend himself.

175.   To make the workplace worse, Cutway and Thomas continued tormenting Carter with their "don't take three days" refrain.

176.   On or about February 10, 2020, Cutway informed Carter that he did not have work for him.

177.   He asked if Carter would be willing to work nights, to which Carter responded "yes."

178.   But Carter was never assigned nights.

179.   The "don't take three days" chastisement and other forms of harassment continued.

180.   Later that month Carter and his white colleague had a disagreement.

181.   Cutway told him that a meeting would be scheduled with Byrd to resolve the issue.

182.   The meeting was convened, however, the other employee was not in attendance.

183.   Byrd did not question Carter or allow him to state his position.

184.   Instead, Byrd disciplined Carter, threatening to terminate him quicker than his head could spin.

185.   On or about March 3, 2020, Carter went to the doctor for a lingering cough.

186.   The doctor confirmed that Carter did not have COVID-19.

187.   The results were given to Cutway.

188.   On March 23, 2020, Cutway threatened to terminate Carter's employment for

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 17 of 27**

having a lingering cough.

189.    By that time Carter had twice went to the doctor for this cough and both times he was confirmed to be free of COVID-19.

190.    Still, Cutway sent him to the nurse.

191.    Again, Carter's temperature was normal.

192.    Then Cutway called to apologize.

193.    At that point Carter had called his wife and said that he needed legal help due to the persistent harassment and disparate treatment by Excel VI.

194.    A white co-worker overheard this conversation.

195.    On March 23, 2020, Mike Handy ("Handy") told Carter that his co-worker had "ratted him out."

196.    Handy said that there had been a meeting between the co-worker, Thomas and Byrd, in which the co-worker told Excel VI's management that Carter was seeking legal help.

### Wrongful Retaliatory Termination

197.    Previously, on or about February 18, 2020, Excel VI laid off approximately one hundred (100) people from the Restart Department.

198.    Upon information and belief no one from Maintenance was laid off.

199.    On or about March 24, 2020, Carter was told that he was being transferred from Maintenance to Restart.

200.    When Carter enquired of his immediate supervisor Rusty Clement ("Clement") concerning the reason for the transfer, no answer was given.

201.    When Carter enquired of Clement whether the transfer was temporary or permanent transfer, no answer was given.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 18 of 27**

202.    Carter was never informed that there was a lack of work in Maintenance or otherwise given any reason for being transferred to a department experiencing layoffs one day after Excel VI learned he was seeking legal redress for their disparate treatment.

203.    On March 26, 2020, two days after being transferred, Carter was laid off.

204.    In response Carter filed a wrongful discharge complaint with the Virgin Islands Department of Labor, a request for arbitration and the EEOC Charge that preceded this Complaint.

205.    Excel VI subjects its better-qualified black, local hires to lesser positions than lesser-qualified non-black, stateside hires.

206.    On or about May 18, 2020, Carter was recalled from the layoff as an instrument fitter.

207.    On or about June 15, 2020, he was given the title of Sr. Instrument Tech.

208.    Carter was not allowed to perform the job of a Sr. Instrument Tech.; he was still required to perform instrument fitter work.

209.    Meanwhile, lesser-qualified white Instrument Technicians were also recalled from lay-off; they were permitted to work as technicians, not as instrument fitters.

210.    Unlike Carter, none of the white Instrument Technicians that were brought back from layoff as Instrument Technicians were certified as NCCER Maintenance Electricians, as NCCER Instrument Technicians or had successfully completed the NCCER written examination for Instrument Technicians.

211.    Carter had all of those certifications.

212.    Yet he was forced to work as an Instrument Fitter for Sr. Instrument Tech. Pay.

*Carter v. Excel VI*
Case No. 3:20-cv-
**Complaint**
Page 19 of 27

## Religious Discrimination

213. Excel VI also targeted and discriminated against Carter on the basis of his religion.

214. Carter is a Christian.

215. Specifically, he is a Seventh-Day Adventist.

216. Excel VI is aware of his religious affiliation because he has obtained permission from his supervisors to finish work on Fridays in time to begin the observance of his Sabbath.

217. This time of religious observance begins at sunset on Fridays and ends at sunset on Saturdays.

218. Carter is unavailable to work during that period to the extent it interferes with the observance of his Sabbath.

219. By the time Carter was recalled, several Instrument Technicians had joined Maintenance.

220. These Instrument Technicians were given overtime every weekend.

221. Carter requested overtime hours, as had been given to his colleagues.

222. Carter was only offered Saturday overtime, which Excel VI knew conflicted with his religious convictions.

223. The other Instrument Technicians were offered overtime on both Saturday and Sunday.

224. Carter persisted in asking for overtime and was told to ask his co-workers if he could work the Sunday shifts assigned to them.

225. Carter was left to ask different co-workers if he could work "their" Sundays.

226.   Carter asked both Cutway and Clement how overtime is assigned; neither one offered an answer.

227.   It was not until many other Instrument Technicians joined the group that an overtime sheet was posted, allowing people an equal opportunity to sign-up for overtime.

228.   By that time Carter had already been financially disadvantaged by Excel VI's discriminatory conduct.

229.   Excel VI's insistence on only assigning Carter overtime on Saturdays was a deliberate act of discrimination on the basis of his religion.

## Discriminatory Compensation

230.   Consistent with its policy of paying local hires lower wages, Excel VI unilaterally reduced Carter's compensation due to his race and national origin.

231.   Carter noticed an unannounced, non-negotiated drop in his rate of compensation.

232.   The VIDOL advertisement to which Carter responded in applying for his position advertised the position at fifty-five dollars per hour ($55.00/hour).

233.   Carter began working in the position earning the advertised rate of pay.

234.   Carter's hours would fluctuate so he did not immediately notice any pay differential.

235.   However, the week ending August 30, 2020, Carter noticed that his rate of pay had been decreased to fifty-two dollars per hour ($52.00/hour).

236.   On October 8, 2020, Carter wrote to Clement, copying two other members of Excel VI's management, Cutway and Ba'Be Guzman ("Guzman") (collectively "management staff"). (Exhibit 1.)

237. The purpose of that correspondence was to learn the reasons for the negative change in his rate of pay and enquire whether there is any merit-based pay differential. (*Id.* at 3.)

238. Sometime thereafter, a meeting was held with Carter and Excel VI's Vice President of Operations, Wally Byrd ("Byrd"). (*Id.* at 2.)

239. During that meeting Byrd explained to Carter that Excel VI and Limetree had entered into a contractual agreement allowing Excel VI to pay local hires at lower rates of compensation than stateside hires. (*Id.*)

240. Excel VI's local hires, including Carter and Excel VI's other visible minority employees in Maintenance, are paid $52.00 per hour, while Excel VI's stateside hires in Maintenance, who are largely non-visible minorities, are paid $55.00 per hour for performing substantially equal work at the Limetree facility.

241. There is no room for consideration of qualification, experience or any merit-based factor in this two-tiered pay system.

242. Byrd explained that stateside hires have additional household expenses that local hires lack. (*Id.*)

243. Finally, Byrd explained that Excel VI does not pay for stateside hires to travel back to the state of their residence and that those hires receive a per diem of only thirty dollars ($30.00). (*Id.*)

244. The per diem received by stateside hires can vary under certain circumstances.

245. Carter memorialized this conversation in November 19, 2020, correspondence to the same management staff as his October 8, 2020, correspondence. (*Id.* at 1.)

246. Carter's November 19, 2020, correspondence enquired concerning the reason

that Excel VI does not provide "equal pay for equal work" and why there is not merit-based compensation at Excel VI. (*Id.* at 1-2.)

247. On November 30, 2020, Byrd responded to that correspondence. (Exhibit 2..)

248. Byrd informed Carter for the first time that he had been hired at the rate of $52.00 per hour, but had received an increase in pay for certain projects that he had worked on. (*Id.* at 1-2.)

249. This is contrary to the VIDOL listing to which Carter applied and was hired.

250. Byrd further explained that local hires and stateside hires are paid at different rates because:

> . . . we will just say that those 2 groups are not similarly situated. Indeed, while it is Excel VI's goal to be able to hire locally to the greatest extent possible, it has not been possible to only hire locally due to numerous circumstances beyond Excel's control. In order to recruit personnel for the skilled positions that have not been filled locally, Excel VI must carefully balance the package it offers to both provide the needed incentive for individuals to uproot their lives to temporarily relocate to St. Croix versus the expenses incurred. We are confident that our pay system is based on legitimate, non-discriminatory business reasons.

(*Id.* at 2.)

251. Excel VI's implementation of a two-tier pay scale to help recruit stateside hires, necessarily discriminates against and oppresses visible minorities and Virgin Islands residents.

252. Excel VI's maintenance of two-tier recruiting and pay scale has as its foundation a more difficult recruitment process and lower rates of pay, while providing an easier recruitment process and higher rates of pay for stateside hires.

253. Excel VI's two-tier pay scale does not take into consideration the qualifications of the individual or any merit-based factor.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 23 of 27**

254.    Excel VI's recruitment and compensation practices impermissibly discriminate on the bases of both race and national origin.

## COUNT I - DISCRIMINATION (RACE AND NATIONAL ORIGIN)

255.    Carter repeats and realleges paragraphs 1 – 254 as though fully set forth herein.

256.    Excel VI maintains a two-tier application system for those seeking employment.

257.    The application system for local, minority hires is vastly more difficult, if not impossible to navigate.

258.    The application for stateside, largely non-minority is vastly easier.

259.    Once hired, Excel VI treats local, minority hire less favorably with respect to on the job treatment, job duties, discipline, rates of pay and other conditions of employment.

260.    Carter suffered the negative impacts of Excel VI's disparate treatment, including loss of compensation, despite being unquestionably qualified for the positions he was in.

261.    Similarly situated non-black employees and employees who are not residents of the U.S. Virgin Islands are treated differently.

262.    Excel VI has discriminated against Carter on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964.

263.    Excel VI has discriminated against Carter on the basis of race and national origin in violation of the Virgin Islands Civil Rights Act, title 10, section 1 *et seq.*, of the Virgin Islands Code and title 24, section 451 *et seq.,* of the Virgin Islands Code.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 24 of 27**

## COUNT II – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
### (DEPRIVING PERSONS OF RIGHTS OR PRIVILEGES)

264.    Carter repeats and realleges paragraphs 1 – 263 as though fully set forth herein.

265.    Excel VI and Limetree entered into a contractual agreement allowing Excel VI to pay local hires at lower rates of compensation than stateside hires.

266.    This contract operates on the basis of an employees race and on the basis of an employees national origin.

267.    Excel VI has conspired with Limetree to interfere with the Civil Rights of its local hires.

268.    Excel VI has conspired to interfere with Civil Rights in violation of title 10, section 1 *et seq.*, of the Virgin Islands Code.

## COUNT III – HARASSMENT

269.    Carter repeats and realleges paragraphs 1 – 268 as though fully set forth herein.

270.    Carter suffered harassment based on his race, color, age and national origin.

271.    Carter suffered harassment that was not inflicted upon Excel VI's stateside, non-minority hires.

272.    Carter was harassed not only by his peers, but his supervisor.

273.    Carter informed Excel VI that the harassment was unwelcome conduct, but Excel VI persisted and widened the group of persons engaging in the unwelcome conduct.

274.    Excel VI encouraged Limetree employees to contribute to the harassment of Carter.

275.    Carter's job performance and the amount of time he took to perform his job were repeatedly and relentlessly criticized, while similarly situated stateside, non-minority hires were afforded ample latitude and time to perform their job.

276.    This severe criticism was so pervasive that it began prior to the time that Carter accepted the position and transpired outside of Excel VI to Limetree employees.

277.    Excel VI is liable for harassment of Carter in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967.

## COUNT IV – HOSTILE WORK ENVIRONMENT UNDER TITLE VII

278.    Carter repeats and realleges paragraphs 1 – 277 as though fully set forth herein.

279.    The harassment, threats, undue criticism, intimidation, reduction in pay, changing of the terms and conditions of his employment and prohibiting Carter from performing the position for which he was hired, instead forcing him to perform the job duties of a lower-ranking position, taken together, essentially changed the terms and conditions of Carter's employment.

280.    The changed terms and conditions of Carter's employment were so severe and pervasive as to create a hostile work environment.

281.    Excel VI created and maintains a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, title 10, section 1 *et seq.*, of the Virgin Islands Code.

*Carter v. Excel VI*
Case No. 3:20-cv-
Complaint
Page 26 of 27

## COUNT V – RETALIATION

282.   Carter repeats and realleges paragraphs 1 – 281 as though fully set forth herein.

283.   When Excel VI's harassment and hostile work environment became overbearing for Carter, Carter spoke to his wife about seeking legal assistance.

284.   This conversation was relayed to Excel VI.

285.   Excel VI retaliated against Carter.

286.   Excel VI transferred Carter to a position that was subject to layoffs.

287.   Excel VI retaliated against Carter in violation of Title VII of the Civil Rights Act of 1964 and title 10, section 1 *et seq.*, of the Virgin Islands Code.

## COUNT VI – RELIGIOUS DISCRIMINATION

288.   Carter repeats and realleges paragraphs 1 – 287 as though fully set forth herein.

289.   Excel VI was aware of Carter's religious affiliation

290.   Excel VI was aware of Carter's religious practice of observing the Sabbath.

291.   Excel VI would only offer Carter overtime during the Sabbath.

292.   Other employees without the same religious affiliation were offered overtime on both Saturdays and Sundays.

293.   Excel VI discriminated against Carter on the basis of his religion in violation of Title VII of the Civil Rights Act of 1964 and title 10, section 1 *et seq.*, of the Virgin Islands Code.

*Carter v. Excel VI*
**Case No. 3:20-cv-**
**Complaint**
**Page 27 of 27**

**WHEREFORE**, Plaintiff Melvin Carter asks the Court to award him the following relief, and such other relief as the Court deems just and proper, against Defendant Excel VI:

a)      compensatory, consequential and punitive damages;

b)      compensation for past and future loss of income;

c)      injunctive relief against Excel VI's discriminatory practices and harassment;

d)      award Plaintiff the costs of this action including reasonable attorney's fees and costs;

e)      pre and post-judgment interest; and

f)      such other relief as the Court deems just and proper.

**PURSUANT TO RULE 30 OF THE FEDERAL RULES OF CIVIL PROCEDURE PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES TRIABLE OF RIGHT BY A JURY.**

Respectfully submitted,

**THE BOYKIN LAW FIRM**

Date: **May 19, 2021**          By:    *s/ Namosha Boykin*
Namosha Boykin
***Attorney for Melvin Carter***
3004 Altona and Welgunst, Ste. 1-310
St. Thomas, U.S. Virgin Islands 00802
Telephone: (340) 228-0799
Email: namosha.boykin@boykinlawfirm.com
**VIRGIN ISLANDS BAR NO.: 1169**